# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

---

NICOLE FINLEY,

     **Plaintiff,**

     v.                           **Case No. 24-CV-1416-SCD**

FRANK J. BISIGNANO,
  *Commissioner of the Social Security Administration,*

     **Defendant.**

---

## DECISION AND ORDER

---

Nicole Finley applied for social security disability benefits based primarily on fatigue and pain stemming from an autoimmune disease. She also alleged she suffered from several mental impairments. After a hearing, an administrative law judge denied the claim for benefits, finding that Finley could still perform a restricted range of sit-down jobs. Finley seeks judicial review of that decision, arguing that the ALJ erred in assessing her alleged mental impairments, erred in evaluating her subjective symptoms, and failed to account for all her alleged limitations. Because Finley has not shown reversible legal error, and because the ALJ's decision is otherwise supported by substantial evidence, I will affirm the denial of disability benefits.

## BACKGROUND

In 2022, Finley applied for disability insurance benefits and supplemental security income under Titles II and XVI of the Social Security Act, claiming that she was unable to work due to various physical and mental impairments.

# I.     Vocational and Medical Background

Finley had a rough childhood. She was born in 1984 and raised in California. *See* R. 727.[1] After her mother passed away when she was about six years old, Finley bounced around living with different family members. R. 727–28. She says that she was abused by both her father and her grandmother and that she sought inpatient mental health treatment to get away from them. Finley moved to Wisconsin when she was fourteen. She didn't graduate from high school, but she did obtain a high school equivalency degree.

Over the years, Finley held numerous jobs. *See* R. 20–25, 246–47, 252–70, 279–88, 728. She worked at fast-food chains, at a gas station, and in retail. She also worked as an in-home caregiver. Finley's most recent job as a part-time bus driver for a nursing facility lasted just a couple of months, ending in August 2021 due to mechanical issues with the transport vehicle and because Finley had moved. *See* R. 20–21, 246, 728. However, Finley says she probably wouldn't have lasted much longer anyway because of her health issues, as she missed work frequently and struggled to lift and push wheelchair-bound clients.

Finley's health issues date back to adolescence. She was diagnosed with attention-deficit/hyperactivity disorder as a young child. *See* R. 369. As a teenager, she suffered from bipolar disorder, anxiety, and depression. *See* R. 369, 734. She also had asthma, used an inhaler, and was obese.

More recently, Finley sought treatment for fatigue and joint pain. In 2016, she was diagnosed with systemic lupus erythematosus.[2] *See* R. 649, 720–23. Finley's mother and sister

---

[1] The transcript is filed on the docket at ECF No. 12-1.

[2] Systemic lupus erythematosus (SLE) is "an inflammatory connective tissue disease of unknown cause that occurs chiefly in women and is characterized especially by fever, skin rash, and arthritis . . . and in serious cases by involvement of the kidneys and central nervous system." *Kirkpatrick v. Liberty Mut. Grp., Inc.*, 856 F. Supp. 2d 977, 981 n.1 (S.D. Ind. 2012) (citation and internal quotation marks omitted).

also had lupus, and they both committed suicide, apparently because they couldn't handle living with the disease. *See* R. 359, 645. Finley's symptoms initially improved with medication (hydroxychloroquine). However, her symptoms returned in 2018, leading a rheumatologist to diagnose Sjogren's syndrome.[3] *See* R. 369, 649. In March 2020, Finley went to the emergency room after dropping a coffee cup. *See* R. 858–62. She reported on and off tingling and weakness in the fingers on her right hand and pain in her right wrist. A physical exam revealed some tenderness in the wrist but no swelling and normal range of motion. She was discharged with over-the-counter anti-inflammatory medication. Finley returned to the ER a few months later complaining about pain and swelling in her ankles and feet. *See* R. 358–67. She exhibited some swelling and tenderness upon examination, but her gait was normal. Finley did not report any health concerns at her annual OB-GYN exam in October 2020. *See* R. 525–29.

Finley alleges that she became disabled in December 2020. *See* R. 205. That month, her autoimmune diagnosis was revised to (class 4) lupus nephritis[4] following bloodwork and a biopsy. *See* R. 431, 649, 662–63. She was prescribed immunosuppressant medication and prednisone. At a follow-up appointment with nephrology in January 2021, Finley reported feeling tired "because she [was] working a lot." R. 431. But she was tolerating the new medications and doing well overall. *See* R. 431–35. Finley reported feeling well at her follow-up appointment in April 2021. *See* R. 440–446. She did report baseline swelling, but she denied having a rash or joint pain, she declined a rheumatologist consultation, and she

---

[3] Sjogren's syndrome is "an autoimmune disease affecting moisture-producing cells." *Tippitt v. Reliance Standard Life Ins. Co.*, 276 F. App'x 912, 913 (11th Cir. 2008).

[4] Lupus nephritis is a complication of SLE that affects the kidneys. *See Kirkpatrick*, 856 F. Supp. 2d at 982 n.3.

3

demonstrated a normal gait during her physical exam. The nephrologist noted that Finley needed to transition to standard lupus nephritis induction therapy.

In 2021, Finley also had several appointments with her primary care physician. At her April appointment, Finley reported that, after years of no manifestations, her lupus symptoms returned in late 2020. *See* R. 447–52. However, she denied having any current joint or skin concerns, she said she was not interested in seeing a rheumatologist, and she did not exhibit any swelling upon examination. Finley also reported having bipolar disorder, though she was not seeing a psychiatrist, and she was not on any mood-related medications. In fact, Finley indicated that she had not needed any psychiatric medication in years. Finley returned to her primary care physician in November. *See* R. 455–57. She said she recently moved to Missouri, where she worked in a "dog breathing panel which is quite active." R. 455. She also said she delivered food for Door Dash when back in Wisconsin "for healthcare and other things." *Id.* Finley denied swelling in her lower extremities and exhibited no swelling upon examination. R. 455–56. Treatment notes from that visit indicate that Finley's bipolar disorder was in full remission and that Finley was overdue for a follow-up with nephrology. R. 456–57.

 Despite the reminder from her primary doctor, Finley did not return to nephrology until July 2022. *See* R. 470–78. She explained that she had moved to Missouri for several months but was settling back in Wisconsin. Finley said she stopped taking all her medications the previous month. She reported a diffuse rash, worsened photosensitivity, joint pain, and swelling in her hands. Notwithstanding those symptoms, Finley told the nephrologist that she remained active by walking regularly and spending time with her dog, Finley did not appear to be in any acute distress, Finley did not have any swelling in her lower extremities, and Finley walked with a normal gait. The nephrologist noted that Finley's lupus had been in

4

complete remission; however, he indicated that Finley's symptoms returned after she abruptly stopped taking her meds and never transitioned to a maintenance regimen. He started Finley back on immunosuppressant medication and prednisone and recommended a rheumatology consult.

Finley's lupus symptoms remained active throughout the rest of 2022. In late July, she went to the ER for severe pain in her right knee and foot. *See* R. 368–74. Finley exhibited tenderness in her knee and foot and pain when extending her knee, but x-rays were negative. She was given opioids and discharged after her pain improved significantly. At an appointment with her primary doctor the following month, Finley reported increased lupus flares and migratory joint pain. *See* R. 479–81. She said the right knee and foot pain had resolved completely, but she still had some pain and swelling in her left lower extremity. Nevertheless, Finley indicated that she had lost twenty pounds over the last ten months and that she was "much more active than she used to be." R. 479. Also, despite reporting just an "ok" mood, she was not on any psychiatric medications, and she didn't think she needed any. The doctor noted that Finley's joint symptoms were no longer severe, and she recommended Finley continue with the lifestyle changes.

In October 2022, Finley started seeing a rheumatologist. *See* R. 647–63. She reported joint pain and swelling in her upper and lower extremities, photosensitivity, and skin rashes. She said the pain was worse with inactivity and that it lasted for about two or three days. During her exam, Finley exhibited mild swelling in her hands but no tenderness and full range of motion in all extremities. The rheumatologist started Finley back on hydroxychloroquine— explaining that she needed to take that medication whether her disease was active or not— prescribed monthly infusions, and increased Finley's immunosuppressant dosage.

5

A few weeks later, Finley followed up with nephrology. *See* R. 496–503. She reported feeling some general improvement with the medication changes, said she was remaining active, and did not demonstrate any abnormalities during her physical exam. The nephrologist noted that, while Finley recently had a flare in her lupus symptoms, she appeared to be on the right track after seeing a rheumatologist and establishing a comprehensive immunosuppressive therapy regimen.

Just when things seemed to be back under control, Finley reported another symptom flare. In late-November 2022, she told rheumatology that she was really struggling with pain and fatigue, especially in her hands and feet. *See* R. 646–47. She said she couldn't drive because it hurt to grip a steering wheel, and some days the pain was so bad she couldn't get out of bed. The rheumatologist increased Finley's prednisone dosage. The following day, Finley received her first infusion. A few weeks later, Finley told rheumatology that the increased dosage wasn't helping and that she was unable to shower or get off the couch due to the pain. *See* R. 645–46. She reported severe pain with any movement and swelling in her hands and was in tears during the telephone encounter, saying she understood why her mother and sister had committed suicide. Because there weren't any rheumatologists available, the nurse who took the call told Finley that the ER would be her best option. The nurse also told Finley that she may need medication for anxiety and possibly depression, too. At the ER, Finley complained of severe joint pain despite compliance with her lupus medications. *See* R. 641–45. She appeared uncomfortable and to be in acute distress during the examination, but she did not have any swelling. She was given opioids and discharged after the pain subsided.

A few days later, Finley followed up with rheumatology. *See* R. 637–41. She reported that the pain was better, but she still had hives. During her exam, Finley did not exhibit any

6

swelling in her hands, she was able to make a full fist bilaterally, and she was able to fully extend her elbows. The rheumatologist noted that Finley's joint pain did not appear to be inflammatory and, therefore, was likely associated with a different impairment, such as fibromyalgia, not lupus. He added gabapentin to Finley's medication list.

Finley's lupus symptoms remained under control throughout 2023. At a rheumatology visit in February, she said she was feeling very good, she did not feel her disease was active, and her rashes and joint pain were much better. *See* R. 633–36. Finley also said she was tolerating the infusions very well, with only mild fatigue for a day or two after. Finley's physical exam was normal, and the rheumatologist recommended tapering off prednisone. At follow-up rheumatology visits that year, Finley reported minor joint aches, some generalized fatigue, and occasional ankle pain, but her physical exams were largely normal, and she reported doing very well overall with her treatment regimen. *See* R. 747–51, 756–63, 815–24. Treatment notes from April indicate that Finley did not have any symptoms of active disease and that Finley's bloodwork was not consistent with active lupus. R. 757. In October, Finley switched from monthly infusions to weekly, at-home injections. *See* R. 814, 816, 823.

Meanwhile, in July 2023, Finley followed up with her primary care physician after she had gone to the ER for shortness of breath. *See* R. 407–13, 846–49. Finley told her primary doctor that she had been taking Lamictal for her anxiety and mood. She said that she had also seen psychiatry, but it was not a good experience, and she wasn't going back.

## II.    Procedural Background

Finley applied for social security benefits in May 2022, alleging that she became disabled and unable to work due to lupus on December 15, 2020. *See* R. 91, 205–08, 240–51. Finley asserted that she couldn't stand for long periods, that her joints swelled for no reason,

that she had hives all over her body, that she got tired for no reason, and that she had no energy. *See* R. 271–78. She further asserted that she spent most of the day in bed due to lupus and fibromyalgia flare-ups and that her boyfriend helped her use the bathroom and performed all other household tasks. Finley claimed that, during a bad flare-up, she wasn't able to lift, squat, bend, stand, reach, walk, sit, kneel, talk, climb stairs, see, or use her hands.

In May 2023, Finley was interviewed by Deirdre Radosevich, a psychologist paid by the state agency charged with reviewing disability applications on behalf of the Social Security Administration. *See* R. 727–28. Finley told Dr. Radosevich that she was unable to do much physically and that her boyfriend organized her medications, helped her shower, and took care of all household activities. Finley reported a history of inpatient mental hospitalizations during adolescence and current symptoms of depression and anxiety. She said she had suicidal ideation due to pain but no plan or intent to act on those thoughts. She described having increased energy a few times a week where she was able to play with her dog and accomplish other tasks, followed by a day in pain. She also said she refused to take medication, and she coped with her feelings by engaging in poetry and woodburning activities. As for anxiety, Finley said she had two or three panic attacks a week, with increased anxiety during pain flares. However, she reported lessening anxiety "with the use of medication writing" and indicated she used deep breathing and self-talk to help address her panic attacks. R. 727.

Dr. Radosevich also performed a mental status examination. *See* R. 729–30. He noted that, during the exam, Finley appeared in pain and needed assistance getting up from her chair. She was polite and cooperative, made good eye contact, provided logical answers, performed well on the immediate recall test, was able to follow a three-step command, and

8

exhibited good insight and judgment. However, she presented with a depressed mood, reported auditory and visual hallucinations, struggled with delayed recall, and claimed she didn't know math.

Dr. Radosevich diagnosed adjustment disorder with mixed anxiety and depressed mood. R. 729. Ultimately, he opined that Finley had mild limitations understanding, remembering, and carrying out simple instructions; no limitations responding appropriately to supervisors and co-workers; mild limitations maintaining concentration, attention, and work pace; moderate limitations withstanding routine work stressors; and a mild limitation adapting to change. R. 730.

Later that month, Finley was assessed by Jason Servi, a physician paid by the state agency to evaluate Finley's physical impairments. *See* R. 732–40. Finley identified lupus, fibromyalgia, anxiety, depression, and Sjogren's syndrome as her main health issues. She told Dr. Servi that she was very fatigued even shortly after getting rest, that she had difficulty doing normal activities because of her fatigue, and that her joint pain was so severe she wanted to "curl up into a ball and die." R. 733–34. She also told Dr. Servi that she was irritable and had several anxiety attacks each week. R. 734. However, she said her anti-anxiety medication had decreased the frequency of her anxiety attacks. As for daily activities, Finley claimed that she needed help grooming and bathing, she was not capable of basic household chores, and she could not handle shopping in stores.

Dr. Servi also performed a physical exam. *See* R. 734–38. Finley exhibited normal speech, memory, and concentration; a mildly anxious mood; and behavior within normal limits. She also had normal strength in all but her right lower extremity (which was 4/5 strength); was able to grasp, shake hands, write, and pick up a pen with both hands; was able

9

to get up and down from the exam table without difficulty; and was able to squat 25% and rise from that position with ease. However, she did exhibit some swelling in her knees; she had some mildly reduced range of motion in her lumbar spine, hips, and knees; and she walked with a mildly antalgic gait without use of an assistive device. Dr Servi noted that Finley had a walker with her, but it appeared she didn't need it for short distances. Dr. Servi did not observe any appreciable findings related to Finley's lupus or fibromyalgia impairments.

Based on his assessment of Finley's performance during the exam and his review of the available medical records, Dr. Servi opined that Finley could frequently sit and stand, could frequently walk, and could frequently lift and carry twenty pounds. R. 738–39.

The state agency denied Finley's applications initially and upon her request for reconsideration. *See* R. 42–108. The reviewing physicians, Gary Friedman and Tom Dees, found that Finley could occasionally lift and carry twenty pounds, could frequently lift and carry ten pounds, could stand or walk (with normal breaks) for a total of four hours during an eight-hour workday, could sit (with normal breaks) for more than six hours total in a typical workday, could push and pull with her upper extremities and her left lower extremity without limitation, and could frequently push and pull with her right lower extremity. R. 49–50, 61–62, 70–71, 81–82. Dr. Friedman and Dr. Dees further found that Finley could only occasionally climb, balance, stoop, kneel, crouch, and crawl. They did not identify any manipulative limitations.

The state agency also assessed Finley's mental impairments. The reviewing psychologists, Annette De Paz and Suzanne Castro, found that Finley had severe but not disabling depression and anxiety. *See* R. 47–48, 50–51, 59–60, 62–63, 68–69, 71–73, 79–80,

10

82–84. Specifically, Dr. Paz and Dr. Castro found that Finley had a moderate limitation in understanding, remembering, or applying information; no limitation in interacting with others; a moderate limitation in concentrating, persisting, or maintaining pace; and a mild limitation in adapting or managing herself.[5] Given those limitations, Dr. Paz and Dr. Castro believed that Finley was able to carry out simple instructions, follow simple work procedures, make simple work-related decisions, sustain attention throughout extended periods of time, perform at a consistent pace (especially when engaging in simple and repetitive tasks), and maintain a regular schedule.

After the state-agency denial, Finley had a hearing with an ALJ. *See* R. 14–41. Finley told the ALJ that she struggled at her most recent jobs as a bus driver and an in-home caregiver due to lupus flares that impaired her ability to lift or push elderly clients. R. 19–25. Finley said her last flare-up was just a few days prior to the hearing, and it lasted for two days. R. 26–27. She indicated that, during a flare-up—which happened several times a month despite taking her medications as prescribed—her joints swelled, she got hives, and she spent most of the day sleeping or in bed. Finley claimed that she couldn't use her hands at all when they were swollen. R. 27–28. She also said that she had recently started weekly at-home injections, which left her feeling very sick, tired, and weak for about one or two days. R. 25–26. When asked to describe a typical day, Finley explained that she spent most of her time in bed or on the couch watching television and that she needed a lot of assistance from her boyfriend. R. 28. She told the ALJ that her constant, daily pain was so severe that most of the time she

---

[5] These four areas of mental functioning are known as the "paragraph B" criteria. See 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(E). The paragraph B criteria are measured on a five-point scale: none, mild, moderate, marked, and extreme. *See id.* § 12.00(F)(2). "Mild" means that the claimant's functioning "independently, appropriately, effectively, and on a sustained basis is slightly limited." *Id.* § 12.00(F)(2)(b). "Moderate" means that the claimant's functioning "independently, appropriately, effectively, and on a sustained basis is fair." *Id.* § 12.00(F)(2)(c).

11

wanted to "curl up in a ball and just get it done over with," as she functioned more like an eighty-eight-year-old than a thirty-eight-year-old. R. 29.

A vocational expert also testified at the hearing. *See* R. 30–40. The vocational expert indicated that a hypothetical person with Finley's age and vocational profile could not perform her past relevant work as a convenience store clerk, a home health aide, or a fast-food services manager if she were limited to a restricted range of sedentary exertional work.[6] R. 30–31. According to the vocational expert, that person could work as a label cutter, a document preparer, an envelope addresser, and a telephone quotation clerk. R. 31–32. The vocational expert further indicated that employers typically tolerate employees to be off task no more than fifteen percent of the workday and to be absent (unexcused) no more than two days per month. R. 33.

On May 31, 2024, the ALJ issued a written decision finding that Finley was not disabled. *See* R. 88–108. The ALJ considered the disability applications under 20 C.F.R. §§ 404.1520 and 416.920, which set forth a five-step process for evaluating DIB and SSI claims. *See* R. 91–104. Relevant here, the ALJ determined at steps two and three of that process that Finley suffered from severe but not presumptively disabling lupus and obesity. R. 94–97.

The ALJ also determined at step two that Finley's mental impairments, either alone or in combination, did not cause more than minimal limitation in her ability to perform basic

---

[6] "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." 20 C.F.R. §§ 404.1567(a), 416.967(a).

mental work activities. R. 94–96. The ALJ noted that the record did not reflect any specialized treatment for mental impairments. He observed that, although treatment notes documented a history of bipolar disorder, Finley denied psychiatric symptoms during the relevant period, said she wasn't interested in seeing a psychiatrist or taking psychiatric medications, and exhibited normal findings upon examination. The ALJ also discussed in detail the May 2023 psychological consultative exam with Dr. Radosevich, during which Finley showed signs of depression and anxiety. Nevertheless, according to the ALJ, the longitudinal evidence supported no more than a mild limitation in any of the four areas of mental functioning. The ALJ determined that Finley's subjective reports of mental limitations and the one-off observation of impaired functioning at the consultative exam were insufficient to support more severe limitations given that Finley consistently presented with normal psychiatric functioning over the three-plus years of medical evidence under review.

In evaluating the severity of Finley's alleged mental impairments, the ALJ considered all the medical opinion evidence in the record. *See* R. 96. The ALJ found unpersuasive the prior administrative medical findings of the reviewing psychologists, Dr. Paz and Dr. Castro. According to the ALJ, those findings were not supported by or consistent with the evidence as a whole, which showed minimal psychiatric treatment, the denial of psychiatric symptoms and medications, and normal psychiatric findings. The ALJ found Dr. Radosevich's opinions somewhat persuasive to the extent they were consistent with Finley's presentation at the consultative exam. However, the ALJ found Dr. Radosevich's opinions unpersuasive in assessing Finley's functioning over the course of the period under review because the longitudinal record—which Dr. Radosevich apparently did not review—consistently documented normal psychiatric functioning. In other words, the other evidence in the record

13

suggested that Finley's functioning during the consultative exam "was not her baseline functioning or even consistent with intermittent or episodic functional limitations." R. 96.

Between steps three and four, the ALJ assessed Finley's residual functional capacity—that is, the most she could do despite her physical and mental limitations, *see* 20 C.F.R. §§ 404.1545(a) and 416.945(a). The ALJ determined that Finley had the RFC to perform a restricted range of sedentary work, including that she could occasionally lift and carry ten pounds; she could frequently lift and carry less than ten pounds; she could stand or walk for two hours total in a typical eight-hour workday; and she could push and pull as much as she could lift and carry. R. 97. The ALJ also determined that Finley could frequently balance; could occasionally stoop, kneel, crouch, crawl, and climb ramps and stairs; could never climb ladders, ropes, or scaffolds; and could not work at unprotected heights, operate moving mechanical parts, or operate a commercial vehicle. In assessing that RFC, the ALJ considered Finley's subjective allegations, the objective medical evidence, and the medical opinion evidence. *See* R. 98–102.

The ALJ determined that Finley's statements concerning the intensity, persistence, and limiting effects of her symptoms were inconsistent with the overall record. *See* R. 98–101. After summarizing Finley's allegations, the ALJ reviewed the objective medical evidence, observing that, throughout 2020 and 2021, Finley largely denied active lupus symptoms,[7] Finley exhibited normal findings upon examination, and Finley declined to consult with a rheumatologist. R. 98–99. The ALJ noted that Finley did report being tired in January 2021, but she attributed that symptom to "working a lot." R. 98 (citing Exhibit 4F/25). The ALJ

---

[7] The ALJ noted earlier in his decision that Finley's fibromyalgia and Sjogren's syndrome symptoms substantially overlapped with her lupus symptoms. *See* R. 94.

also noted a gap in treatment for Finley's severe impairments while she was living in Missouri from mid-2021 to mid-2022. R. 99. The ALJ acknowledged that, when Finley moved back to Wisconsin around July 2022, she reported a flare in symptoms. However, according to the ALJ, those symptoms improved once Finley re-established her treatment regimen. R. 99–100. The ALJ observed that, throughout 2023, Finley reported doing well overall, said she had almost no active symptoms, and exhibited very few abnormalities during her physical exams.

The ALJ also explained the bases for his specific RFC findings. *See* R. 100–01. The ALJ noted that Finley was morbidly obese during the relevant period, with a BMI above 40. The ALJ said he accounted for Finley's weight, in combination with her reported pain and fatigue, by limiting her to sedentary work with postural and environmental limitations. According to the ALJ, additional limitations were not warranted given the largely normal physical exam findings, with no indication of impaired use of the upper extremities or side effects from the infusions either on examination or in reports to her providers.

Finally, the ALJ considered the medical opinion evidence. *See* R. 101–02. The ALJ found generally persuasive the prior administrative medical findings of Dr. Friedman and Dr. Dees, who found that Finley was capable of a restricted range of light exertional work. However, the ALJ assessed additional limitations, including in Finley's tolerance for postural activities and exposure to environmental factors, to better account for the combination of her obesity and pain symptoms. The ALJ found Dr. Servi's opinions not to be very persuasive because they were unexplained and not clearly supported by the physical consultative exam. And, as explained at step two, the ALJ found unpersuasive the prior administrative medical findings of Dr. Paz and Dr. Castro and partially persuasive the opinions of Dr. Radosevich.

15

The ALJ then continued with the sequential evaluation process. At step four, the ALJ determined that Finley could not perform her past relevant work as a fast-food manager, a store clerk, or a home health aide. R. 102. Relying on the vocational expert's testimony, the ALJ determined at step five that there were jobs that existed in significant numbers in the national economy that Finley could still perform. R. 102–04. Based on the step-five finding, the ALJ determined that Finley was not disabled from her alleged onset date through the date of the decision. R. 104.

The Social Security Administration's Appeals Council denied Finley's request for review, R. 1–6, making the ALJ's decision a final decision of the Commissioner of the Social Security Administration, *see Loveless v. Colvin*, 810 F.3d 502, 506 (7th Cir. 2016) (citing *Varga v. Colvin*, 794 F.3d 809, 813 (7th Cir. 2015)).

In November 2024, Finley filed this action seeking judicial review of the Commissioner's decision denying her claim for disability benefits under the Social Security Act, 42 U.S.C. § 405(g). *See* Compl., ECF No. 1. The matter was reassigned to this court after all parties consented to the jurisdiction of a magistrate judge under 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73(b). *See* ECF Nos. 5, 6 & 8. Finley filed a brief in support of her disability claim, *see* ECF No. 13; the acting commissioner of the Social Security Administration filed a brief in support of the ALJ's decision, *see* ECF No. 21; and Finley filed a reply brief, *see* ECF No. 24.

## LEGAL STANDARDS

"Judicial review of Administration decisions under the Social Security Act is governed by 42 U.S.C. § 405(g)." *Allord v. Astrue*, 631 F.3d 411, 415 (7th Cir. 2011) (citing *Jones v. Astrue*, 623 F.3d 1155, 1160 (7th Cir. 2010)). Pursuant to sentence four of § 405(g), federal courts have

16

the power to affirm, modify, or reverse the Commissioner's decision, with or without remanding the matter for a rehearing. A reviewing court will reverse the Commissioner's decision "only if the ALJ based the denial of benefits on incorrect legal standards or less than substantial evidence." *Martin v. Saul*, 950 F.3d 369, 373 (7th Cir. 2020) (citing *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000)).

"Substantial evidence is not a demanding requirement. It means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Martin*, 950 F.3d at 373 (quoting *Biestek v. Berryhill*, 587 U.S. 97, 103 (2019)). "When reviewing the record, this court may not re-weigh the evidence or substitute its judgment for that of the ALJ." *Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004) (citing *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003)). Rather, the court must determine whether the ALJ built an "accurate and logical bridge between the evidence and the result to afford the claimant meaningful judicial review of the administrative findings." *Beardsley v. Colvin*, 758 F.3d 834, 837 (7th Cir. 2014) (citing *Blakes v. Barnhart*, 331 F.3d 565, 569 (7th Cir. 2003); *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001)).

## DISCUSSION

Finley seeks remand for rehearing, arguing that the ALJ committed reversible legal error in assessing her RFC and that substantial evidence does not support the ALJ's step-five finding. Specifically, Finley contends that the ALJ erred in assessing her alleged mental impairments, erred in evaluating her subjective symptoms, and failed to account for all her alleged limitations.

"RFC is an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause

17

physical or mental limitations or restrictions that may affect . . . her capacity to do work-related physical and mental activities." Social Security Ruling No. 96-8p, Policy Interpretation Ruling, Titles II and XVI: Assessing Residual Functional Capacity in Initial Claims, 1996 WL 374184, 1996 SSR LEXIS 5, at *5 (July 2, 1996). "Ordinarily, RFC is the individual's *maximum* remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis"—that is, "8 hours a day, for 5 days a week." *Id.* When assessing a claimant's RFC, the ALJ must consider *all* the relevant evidence in the case record—including medical records, observations of treating providers and other medical sources, and the claimant's own description of her symptoms and limitations—and the limiting effects of *all* the claimant's impairments. *See* 20 C.F.R. §§ 404.1545, 416.945; SSR No. 96-8p, 1996 SSR LEXIS 5, at *13–15. "Crucially, however, an ALJ need only include limitations that are supported by the medical record." *Reynolds v. Kijakazi*, 25 F.4th 470, 473 (7th Cir. 2022) (citing *Deborah M. v. Saul*, 994 F.3d 785, 791 (7th Cir. 2021)).

## I.     The ALJ Did Not Reversibly Err in Assessing Finley's Mental Impairments

Finley first argues that the ALJ erred in finding that she did not suffer from any severe mental impairments and that her mental impairments did not result in any RFC limitations. She accuses the ALJ of "playing doctor" by substituting his lay opinion for that of the medical experts, all of whom determined that Finley had moderate or mild limitations in mental functioning. According to Finley, the prior administrative medical findings of the state-agency reviewing psychologists are consistent with the medical opinions of the psychological consultative examiner. Finley further maintains that the medical opinions and the prior administrative medical findings were supported by the results of the consultative exam, where

Finley reported symptoms of depression and anxiety, exhibited a depressed mood and a congruent affect, and demonstrated issues with delayed recall.

Although the ALJ must consider medical opinions and prior administrative medical findings when assessing a claimant's RFC, *see* SSR No. 96-8p, 1996 SSR LEXIS 5, at *20–21, "the determination of a claimant's RFC is a matter for the ALJ alone—not a treating or examining doctor—to decide," *Thomas v. Colvin*, 745 F.3d 802, 808 (7th Cir. 2014) (citing 20 C.F.R. § 404.1527(d)). Nevertheless, "[i]f the RFC assessment conflicts with an opinion from a medical source, the [ALJ] must explain why the opinion was not adopted." SSR No. 96-8p, 1996 SSR LEXIS 5, at *20. The ALJ must consider the persuasiveness of all medical opinions and all prior administrative medical findings in the record using five factors: supportability, consistency, relationship with the claimant, specialization, and other factors that tend to support or contradict a medical opinion or a prior administrative medical finding. *See* 20 C.F.R. §§ 404.1520c, 416.920c. While the ALJ may consider all five factors, he needs to explain in his decision how he considered only the supportability and consistency factors. *See* 20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2).

The ALJ did not err in assessing Finley's mental impairments. He acknowledged that Finley had a history of bipolar disorder, depressive disorder, anxiety disorder, and ADHD. *See* R. 94. However, the ALJ reasonably determined that those impairments, considered singly and in combination, did not cause more than minimal limitation in Finley's ability to perform basic mental work activities. In reaching that conclusion, the ALJ did not make any independent medical findings. Rather, he based his conclusion on the medical evidence in the record. For example, the ALJ correctly observed that Finley did not seek any specialized treatment for her mental impairments during the relevant period. *See* R. 95. The ALJ

19

discussed visits in 2021, where Finley reported that she was not on any mood-related medications, she did not have a psychiatrist, and she had not required psychiatric medication in years. R. 95 (citing Exhibits 3F/42; 4F/41). The ALJ further noted that Finley denied psychiatric symptoms at subsequent appointments and consistently presented with intact/normal memory, normal thought content, normal mood and behavior, and good judgment and insight. *Id.* (citing Exhibits 3F/43, 47, 61; 4F/38; 8F/8, 18; 11F/5; 13F/35; 15F/4; 16F/13, 20, 25, 31, 39).

The ALJ also sufficiently explained why he did not adopt the opinions of the consultative examiner or the findings of the reviewing psychologists. The ALJ acknowledged that Finley demonstrated some abnormal findings during her May 2023 consultative exam with Dr. Radosevich. *See* R. 95 (citing Exhibit 6F). Based on those exam findings, Dr. Radosevich assessed a moderate limitation in withstanding routine work stressors and mild limitations with understanding and memory, sustained concentration and persistence, and adapting to change. R. 96 (citing Exhibit 6F/4). Reviewing psychologists Dr. Paz and Dr. Castro relied almost entirely on the consultative exam findings when they assessed moderate and mild mental limitations. R. 96 (citing Exhibits 2A; 4A; 5A; 7A).[8] Nevertheless, the ALJ reasonably determined that Finley's subjective reports of mental health symptoms and the one-off observation of impaired functioning at the consultative exam were substantially outweighed by more than three years of no specialized treatment, denied symptoms, and normal psychiatric functioning. R. 95–96. In other words, according to the ALJ, the medical opinions and the prior administrative medical findings were not supported by or consistent

_____

[8] Although Dr. Paz and Dr. Castro said the record contained evidence of "treatment for mental conditions," the only specific evidence they discussed was the consultative exam. *See* R. 48, 51, 60, 63, 69, 72, 80, 83.

with the longitudinal evidence of record. Substantial evidence supports that finding. *See Beardsley*, 758 F.3d at 839 (noting that "an ALJ is not required to credit the agency's examining physician in the face of . . . other compelling evidence").

Finley insists that the ALJ committed reversible legal error when he failed to consider and address possible reasons Finley did not seek psychological treatment. As support, Finley relies on Social Security Ruling No. 16-3p, which pertains to evaluating a claimant's alleged symptoms, not evaluating medical opinion evidence. *See* SSR No. 16-3p, Policy Interpretation Ruling Titles II and XVI: Evaluation of Symptoms in Disability Claims, 2016 WL 1119029, 2016 SSR LEXIS 4 (Mar. 16, 2016). At any rate, in finding Finley's mental impairments to be non-severe, the ALJ did not merely rely on the lack of specialized mental health treatment. Rather, the ALJ correctly observed that, during the relevant period, Finley consistently denied mental health symptoms, Finley refused psychiatric medications, and Finley presented with normal psychiatric findings at the medical appointments she did attend. Any alleged inability to afford treatment is therefore irrelevant. Finley also says that her bipolar disorder may have impaired her ability to recognize the need for treatment. But the record reflects that Finley's bipolar disorder was in full remission during the entire period under review. *See* R. 455–56.

In sum, Finley has failed to show that the ALJ reversibly erred in assessing her mental impairments.

## II. The ALJ's Subjective-Symptom Evaluation Is Not Patently Wrong

Finley generally alleged that her impairments affected her ability to lift, squat, bend, stand, reach, walk, sit, kneel, talk, climb stairs, see, and use her hands. *See* R. 25–29, 271–78. The ALJ acknowledged Finley's alleged symptoms but determined that her statements about the intensity, persistence, and limiting effects of those symptoms were inconsistent with the

21

overall record, including Finley's own statements to providers and Finley's response to treatment. *See* R. 98–101. Finley challenges the reasons the ALJ offered for discrediting her alleged symptoms, arguing that the ALJ mischaracterized certain evidence and ignored evidence contrary to his conclusion.

"In determining whether an individual is disabled, [the Social Security Administration] consider[s] all of the individual's symptoms, including pain, and the extent to which the symptoms can reasonably be accepted as consistent with the objective medical and other evidence in the individual's record." SSR No. 16-3p, 2016 SSR LEXIS 4, at *2–3. A "symptom" is "the individual's own description or statement of . . . her physical or mental impairment(s)." *Id.* at *3 (citing 20 C.F.R. §§ 404.1502(i), 416.902(n)). Under social security regulations, "an individual's statements of symptoms alone are not enough to establish the existence of a physical or mental impairment or disability." *Id.*

"However, if an individual alleges impairment-related symptoms, [the ALJ] must evaluate those symptoms using a two-step process." SSR No. 16-3p, 2016 SSR LEXIS 4, at *3 (citing 20 C.F.R. §§ 404.1529, 416.929). First, the ALJ must "determine whether the individual has a medically determinable impairment (MDI) that could reasonably be expected to produce the individual's alleged symptoms." *Id.* at *5. Second, the ALJ must "evaluate the intensity and persistence of an individual's symptoms such as pain and determine the extent to which an individual's symptoms limit . . . her ability to perform work-related activities." *Id.* at *9. At the second step, the ALJ must "examine the entire case record, including the objective medical evidence; an individual's statements about the intensity, persistence, and limiting effects of symptoms; statements and other information provided by medical sources and other persons; and any other relevant evidence in the individual's case record." *Id.* at *9–

22

10. When reviewing evidence other than objective medical evidence, the ALJ may consider several factors, including the claimant's daily activities; the location, duration, frequency, and intensity of the claimant's symptoms; factors that precipitate and aggravate the claimant's symptoms; the type, dosage, effectiveness, and side effects of the claimant's medications; other treatment the claimant has received for symptom relief; and any other measures the claimant has used to relieve her symptoms. *Id.* at *18–19; *see also* §§ 404.1529(c), 416.929(c).

Reviewing courts "will overturn an ALJ's decision to discredit a claimant's alleged symptoms only if the decision is 'patently wrong,' meaning it lacks explanation or support." *Cullinan v. Berryhill*, 878 F.3d 598, 603 (7th Cir. 2017) (quoting *Murphy v. Colvin*, 759 F.3d 811, 816 (7th Cir. 2014)). "A credibility determination lacks support when it relies on inferences that are not logically based on specific findings and evidence." *Id.* (citing *Murphy*, 759 F.3d at 816). "In drawing its conclusions, the ALJ must 'explain her decision in such a way that allows [a reviewing court] to determine whether she reached her decision in a rational manner, logically based on her specific findings and the evidence in the record.'" *Murphy*, 759 F.3d at 816 (quoting *McKinzey v. Astrue*, 641 F.3d 884, 890 (7th Cir. 2011)).

Finley accuses the ALJ of discounting the veracity of her alleged statements because she was not interested in seeking treatment from a rheumatologist. A review of the decision reveals that the ALJ did no such thing. The ALJ accurately observed that Finley *initially* was not interested in seeing a rheumatologist. *See* R. 98–99 (citing Exhibit 4F/41); *see also* R. 440 ("She is not currently followed by rheumatology but declines a consult at this time."). However, the ALJ noted that Finley did eventually seek treatment from a rheumatologist, and he discussed those visits in detail in his decision. *See* R. 99–100 (citing Exhibits 4F/93–98;

23

5F/20–21; 8F/6–9; 10F/7–10; 13F/3–7, 33–34, 57–58, 62–65, 68–73). Put simply, nothing in the ALJ's decision suggests that he held Finley's initial rheumatology reluctance against her.

Finley also accuses the ALJ of ignoring evidence of ongoing symptoms and placing too much emphasis on temporary periods of improvement. Again, a careful review of the decision belies Finley's argument. Finley alleged that she became disabled in December 2020. *See* R. 205. The ALJ acknowledged that, around that time, Finley's diagnosis was changed from Sjogren's syndrome to lupus. *See* R. 98 (citing Exhibit 13F/69). However, the ALJ correctly observed that, throughout late 2020 and all of 2021, Finley denied active lupus symptoms, claimed to be working two jobs (one with dogs, the other as a delivery driver), and exhibited no abnormal findings during her physical exams. R. 98–99 (citing Exhibit 4F/11, 25, 34–38, 41, 49–50). Finley therefore did *not* consistently report disabling pain and fatigue.

Moreover, contrary to Finley's argument, the ALJ did not ignore evidence of symptom exacerbations or abnormal objective findings. The ALJ acknowledged that, during a visit with nephrology in July 2022, Finley reported having a skin rash, worsened photosensitivity, and joint pain and swelling in her hands. R. 99 (citing Exhibit 4F/67–73). The ALJ also acknowledged that Finley complained about joint pain and fatigue at other visits throughout that year. *See* R. 99–100 (citing Exhibits 1F/17, 21; 4F/76–78; 13F/68–73). And the ALJ noted times where Finley exhibited mild swelling, reduced range of motion, a mildly antalgic gait, and some tenderness during her physical exams. R. 99 (citing Exhibits 4F/76–78; 13F/68–73), R. 100 (citing Exhibits 7F; 13F/3–7).

Nevertheless, the ALJ accurately noted that Finley's exacerbation of symptoms coincided with a significant gap in treatment. After seeing her nephrologist in April 2021, *see* R. 98 (citing Exhibit 4F/34–38), Finley went more than a year without any follow-up

24

treatment for her severe impairments. She returned to nephrology in July 2022 and explained that she had recently moved back to Wisconsin from Missouri. R. 99 (citing Exhibit 4F/67–73). Finley also told her nephrologist that, while she had been tolerating her medications, she stopped taking them the previous month. Finley then re-engaged with nephrology, got established on a comprehensive immunosuppressive therapy regimen (including immunosuppressant medication, prednisone, and infusions), and started seeing a rheumatologist. *See* R. 99–100. As the ALJ observed, Finley's symptoms remained under control on that treatment regimen. R. 99–100 (citing Exhibits 4F/93–98; 8F/6–9; 13F/3–7, 33–34, 57–58, 62–65; 15F/1–6; 16F/4). Finley reported improvement in her pain and doing well overall, claimed to be as active as ever, and denied active lupus symptoms. Also, her bloodwork was inconsistent with active lupus, and her physical exams were largely normal.

Crucially, however, the ALJ did not claim that Finley was symptom-free. The ALJ noted that Finley continued to complain about minor, generalized fatigue—including for a day or two after her infusions—and occasional joint pain. *See* R. 100 (citing Exhibits 8F/6–9; 13F/3–7, 57–58). However, the ALJ reasonably determined that Finley's lupus symptoms were not as limiting as she alleged. Substantial evidence, including Finley's own statements to providers *and* overwhelmingly normal objective findings, supports that conclusion.

In sum, the ALJ's decision to discredit Finley's allegedly disabling symptoms is not patently wrong, as that decision is logically explained and supported by the record.

## III. The ALJ Sufficiently Accounted for All Limitations That Are Supported by The Medical Record

Finally, Finley argues that that the ALJ failed to account for her ongoing fatigue, her hand pain, and her obesity. I disagree.

25

Start with fatigue. Finley insists that the record is replete with instances of her reporting fatigue, especially after receiving infusions. That's true. But the ALJ discussed Finley's reported fatigue throughout his decision. For example, the ALJ noted that Finley reported feeling tired at a nephrology visit in April 2021 but that she attributed her fatigue to "working a lot." R. 98 (citing Exhibit 4F/25). The ALJ also noted that Finley reported having minor fatigue for a day or two after her infusions. R. 100 (citing Exhibit 13F/57–58). And the ALJ noted other reports of fatigue in May and September 2023. *See* R. 100 (citing Exhibits 7F; 13F/3–7).

Moreover, the ALJ explicitly accounted for Finley's fatigue in his RFC assessment. He explained that, as a result of Finley's fatigue (and other symptoms), he limited Finley to sedentary work with numerous postural limitations. *See* R. 97, 100–01. That wasn't enough, according to Finley. She criticizes the ALJ for not explaining how someone with fatigue could consistently perform full-time, competitive work. But as explained above, the ALJ reasonably determined that Finley was not as limited as she alleged. Also, Finley does not point to any significant evidence of fatigue that the ALJ ignored or any evidence that compelled additional fatigue-based limitations.

The ALJ also considered Finley's ongoing joint pain. Specifically, the ALJ noted that, in both her function report and at the administrative hearing, Finley reported pain and swelling in her joints that caused difficulty using her hands. *See* R. 98 (citing Exhibit 4E; Hearing testimony). The ALJ also noted that Finley occasionally complained to her providers about swelling and hand pain and that at times Finley exhibited swelling in her hands upon examination. *See* R. 99 (citing Exhibits 4F/67–73, 76–78, 93–98; 13F/68–73). However, the ALJ correctly observed that Finley demonstrated normal dexterity at the May 2023 physical

consultative exam. *See* R. 100 (citing Exhibit 7F). And the ALJ cited other examples where Finley did not have any swelling in her hands and was able to make a full fist bilaterally. *See* R. 99–100 (citing Exhibits 8F/6–9; 13F/33–34, 57–58, 62–65).

Finley criticizes the ALJ for not including any hand limitations in the RFC assessment or explaining why such limitations were not warranted. But aside from her subjective complaints—which the ALJ reasonably discredited—Finley does not cite any evidence compelling additional limitations. The reviewing physicians did not assess any manipulative limitations. *See* R. 49, 61, 71, 82. Neither did the physical consultative examiner, Dr. Servi. *See* R. 738. Substantial evidence therefore supports the ALJ's decision not to include a hand limitation in the RFC assessment. *See Reynolds v. Kijakazi*, 25 F.4th at 473.

Lastly, the ALJ sufficiently considered and accounted for Finley's obesity. The ALJ found obesity to be a severe impairment at step two of the sequential evaluation process. *See* R. 94. At step three, the ALJ explained that he considered Finley's obesity in accordance with Social Security Ruling No. 19-2p, Policy Interpretation Ruling, Titles II and XVI: Evaluating Cases Involving Obesity, 2019 WL 2374244, 2019 SSR LEXIS 2 (Mar. 20, 2019). *See* R. 97. The ALJ mentioned in his summary of the medical evidence that Finley was morbidly obese, with a BMI over 40. *See* R. 100 (citing Exhibits 5F/17, 84; 8F/59; 10F/10; 12F/3; 13F/6; 15F/3, 8). And the ALJ explained that he accounted for Finley's weight by limiting her to sedentary work with postural and environmental limitations. *See* R. 100–01.

Finley criticizes the ALJ for not explaining how someone who is morbidly obese could sit for six hours in an eight-hour workday. But she cites no evidence supporting greater limitations. The reviewing physicians explicitly considered Finley's obesity when they found that she could sit (with normal breaks) for more than six hours total in a typical workday. *See*

27

R. 49–50, 61–62, 70–71, 81–82. And Dr. Servi opined that Finley could frequently sit. *See* R. 738. Substantial evidence therefore supports the ALJ's evaluation of how Finley's weight would impact her ability to work. *See Bakke v. Kijakazi*, 62 F.4th 1061, 1070 (7th Cir. 2023) ("ALJs properly account for a claimant's obesity by acknowledging the ways that obesity can impact and compound each of the claimant's impairments.") (citation omitted).

In sum, the ALJ sufficiently accounted for all limitations that are supported by the medical record.

## CONCLUSION

Finley has not shown that the ALJ committed reversible legal error in assessing her alleged mental impairments, evaluating her subjective symptoms, or accounting for her alleged limitations, and substantial evidence supports the ALJ's decision. Accordingly, for all the foregoing reasons, I **AFFIRM** the Commissioner's decision. The clerk of court shall enter judgment accordingly.

**SO ORDERED** this 26th day of September, 2025.

STEPHEN C. DRIES
United States Magistrate Judge

28